## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**

**JOSEPH FERNANDES,**

**Defendant.**

**Criminal No.  06-197 (JDB)**

## MEMORANDUM OPINION

Now before the Court are six motions filed by defendant Joseph Fernandes, including a

motion to dismiss for violation of defendant's Sixth Amendment right to a speedy trial.[1]  For the

reasons explained below, the Court will grant defendant's motion to dismiss on speedy trial

grounds.  Defendant's remaining motions will therefore be denied as moot.

## BACKGROUND

From 1991 to 2004, defendant was an employee of the U.S. Environmental Protection

Agency ("EPA").  His job responsibilities at EPA included reviewing Notifications Forms for new

or re-labeled fuel additives, and then -- if the Notification Forms were in order -- registering those

fuel additives.  Under the Clean Air Act, 42 U.S.C. § 7545, a fuel additive may not be sold until it

is registered with the EPA.

The indictment alleges that in September 2001, defendant began submitting false

Notification Forms to the EPA that he himself was responsible for registering.  See Indictment of

Joseph Fernandes ¶ 12.  The forms were "false," it is alleged, because they failed to disclose his

---

[1] Defendant raises the speedy trial issue under the Sixth Amendment only; he does not
contend that his rights under the Speedy Trial Act, 18 U.S.C. § 3161, et seq., were violated.

financial connection with the companies submitting the forms.  Id.  Two of the forms were also

allegedly false because they were submitted as "re-labels" -- a designation that requires less

information and less testing for registration.  Id.  Based on these submissions, defendant is

charged with making criminal false statements under 8 U.S.C. § 1101.  Defendant is also charged

under the financial conflict of interest statute, 18 U.S.C. §§ 208, 216.  The government alleges

that defendant "knowingly and willfully participate[d] personally and substantially in the

particular matter in which he . . . had a financial interest."  Indict. ¶ 30.

      The investigation of defendant began in August 2004.  Def. Mem. at 1.  After several

months of investigation, the government obtained two search warrants, which agents executed in

late June 2005.  Id. at 2.  Pursuant to those warrants, agents searched defendant's home and a

storage locker.  Thus notified of the investigation, defendant hired counsel.[2]  In August 2005, the

government prosecutor, Noreen McCarthy, met with defense counsel to discuss the parameters of

a potential plea.  Id.  For the remainder of 2005, and until April or May 2006, McCarthy and

defense counsel negotiated the terms of a potential plea.  In May 2006, the government learned

that defendant had left the country to go to India.  Id.  The government has not argued -- in

briefing or in argument before the Court -- that defendant left the country because of the

government's investigation.  Rather, it appears that defendant traveled to India and stayed there to

attend to unrelated civil litigation.  See Gov't Ex. 5 (letters describing defendant's litigation in

India).[3]

_____

   [2] Over the course of the next year, defendant hired several different attorneys.

   [3] Unless otherwise noted, "Gov't Ex." and "Def. Ex." refer to exhibits introduced at the
April 22, 2009 hearing.

The government obtained the present indictment, under seal, on June 30, 2006.  FBI Special Agent Lisa Kite Hill then entered defendant's arrest information into the National Crime Information Center ("NCIC"), a national criminal database.  Transcript of April 22, 2009 Hearing ("Tr.") at 40-41.  Hill also put a "lookout" on defendant with Immigration and Customs Enforcement ("ICE"), an agency of the U.S. Department of Homeland Security.  Id. at 41.  Lookouts notify law enforcement personnel when an individual with an outstanding arrest warrant returns to the United States.  Id.  In late June 2006, Hill learned that defendant might return to the United States on July 18 or 19, 2006 via Dulles Airport.  She prepared for a possible arrest at Dulles, but upon learning that defendant had not boarded a connecting flight, she called off the effort.  Id. at 41-42.

Several weeks later, in early August 2006, the government sought assistance in securing defendant's return from India from the Office of Inspector General of the Social Security Administration ("SSA").  Tr. at 19.  Special Agent Sean Stephenson agreed to pose as a SSA field representative, contact defendant, and attempt to initiate a meeting.  Id. at 19, 22-23.  On August 21, 2006, Stephenson emailed defendant and advised him that his Social Security benefits would be terminated because he had been out of the country for more than 30 days.  See Gov't Ex. 1 at 5-6.  Stephenson proposed a meeting.  Id.  That day, Stephenson and defendant exchanged several emails and a phone call, and Stephenson suggested that defendant might visit the U.S. embassy to address this benefits issue rather than returning to the United States.  Id.; see also Tr. at 23-24.  Defendant apparently did not respond, and Stephenson did not attempt to contact him again.  Tr. at 36.

After this failed "ruse," the government's affirmative efforts to secure defendant's return to

the United States ceased.  Nevertheless, between August 2006 and May 2008 -- when defendant

returned to the United States on his own volition -- several other events occurred that inform the

analysis that follows.  On September 26, 2006 -- entirely unrelated to the government's criminal

case against defendant -- the SSA terminated defendant's Social Security benefits.  See Gov't Ex.

2.  The SSA sent a letter to defendant's last known address (in Virginia) and advised that the

benefits were terminated because of an outstanding arrest warrant.  Id.

      In mid-November 2007, defendant visited the U.S. consulate in Mumbai, India, advised

consulate staff that he had lost his passport, and requested a new one.  Tr. at 44-46.  Because

defendant had been entered into the NCIC and ICE databases, McCarthy and other government

officials learned of defendant's request.  McCarthy, Hill, and an attorney from the Office of

International Affairs at the Department of Justice held a conference call.  Id. at 46.  For the first

time, they discussed the possibility of seeking defendant's extradition from India.  Tr. at 60.  But

they decided that an extradition request would be inefficient because extradition could take

several years.  Id. at 46, 56-57.  Rather than seeking extradition -- formally or informally -- they

took defendant's request for a new passport to mean that he intended to return to the United States

on his own.  Id. at 46-47.  On that reasoning, McCarthy informed consulate staff that they could

issue defendant a new passport, id. at 47-49, and a new passport was issued to defendant on

January 16, 2007, see Def. Ex. 1.

      In early December 2007, defendant initiated email communication with A.J. Kramer, the

Federal Public Defender for the District of Columbia.  Defendant noted that "he believed that

there were charges pending" against him in the United States.  Transcript of May 27, 2008

Removal Proceedings at 36.  Kramer then contacted McCarthy, who declined to provide

information about the case.  Kramer explained to defendant that McCarthy's refusal to provide

information "must mean that they believe you are a fugitive and have a sealed warrant for you."

Id. at 37.

On December 22, 2007, defendant re-initiated contact with Special Agent Stephenson.

Gov't Ex. 1 at 4.  Defendant told Stephenson that his return to the United States was imminent and

asked what he needed to do to have his benefits reinstated.  It appeared to Stephenson that

defendant "did not know why his benefits were terminated."  Tr. at 30.  Defendant, Stephenson,

and Stephenson's supervisor, Christopher Cherry, exchanged seven emails over the next several

weeks.  Stephenson and Cherry repeatedly emphasized the need to meet with defendant in person,

and defendant advised that his return to the United States had been postponed because of "legal

issues."  Gov't Ex. 1 at 2; see also Tr. at 30-32.  Communications ceased after January 11, 2008.

Gov't Ex. 1 at 1.

Sometime before May 7, 2008, defendant again contacted the U.S. consulate in Mumbai.

This time he asked for assistance in obtaining an exit permit to leave India.  On May 7, 2008, the

consulate wrote a letter on defendant's behalf to the Indian government seeking "every courtesy in

issuing Mr. Fernandes an exit permit."  Gov't Ex. 3.  Defendant received an exit permit on May

26, 2008, left India the next day, and was arrested upon his return at JFK International Airport in

New York.  See Tr. at 73.

A draft letter was found in defendant's luggage, which was searched upon his arrest.  See

Gov't Ex. 4.  In the letter -- dated December 12, 2007 but never mailed -- defendant wrote:

> I am not a fugitive.  I came to know that I have an arrest warrant
> when a staff from the Social Service Office called me and told me
> that my retirement benefits will be terminated.  After a period of
> few months, I learnt that my Social Security Benefit was stopped.  I

have also been told that I will be arrested when I arrive USA.

Id.

A removal proceeding was held in the Eastern District of New York on May 27, 2008, at the conclusion of which this case was transferred to this Court.  Defendant was arraigned on June 11, 2008.  On March 2, 2009, defendant filed the present motion to dismiss, which has been fully briefed.  The Court heard argument and took evidence at a hearing on April 22, 2009, and the motion is now ripe for resolution.

## ANALYSIS

The Sixth Amendment to the U.S. Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial."  U.S. Const. amend. VI. "Excessive delay in prosecuting a defendant after he is indicted . . . violates this Sixth Amendment right."  See United States v. Tchibassa, 452 F.3d 918, 922 (D.C. Cir. 2006) (citing Barker v. Wingo, 407 U.S. 514 (1972)).  If a delay between indictment and arrest exceeds one year, then courts apply the following four-factor analysis to determine whether the delay is unconstitutional: "whether delay . . . was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result."  Doggett v. United States, 505 U.S. 647, 651 (1992) (citing Barker, 407 U.S. at 530).  "None of the four factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial'; 'rather, they are related factors and must be considered together with such other circumstances as may be relevant.'"  Tchibassa, 452 F.3d at 923 (quoting Barker, 407 U.S. at 533) (brackets omitted).  But a careful review of speedy trial jurisprudence reveals that while all four factors are relevant, the

second factor -- who is more to blame for the delay -- often dictates the outcome of cases.  See, e.g., United States v. Loud Hawk, 474 U.S. 302, 315 (1986) ("The flag all litigants seek to capture is the second factor, the reason for delay."); United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988) ("The crux of this case turns on the reason for the delay.").

## I.      First Factor:  Length of Delay

"The first factor entails 'a double enquiry':  First, 'simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness.'"  Tchibassa, 452 F.3d at 923 (quoting Doggett, 505 U.S. at 651-52) (brackets omitted).  A delay of more than one year is "presumptively prejudicial" and triggers the four-factor Barker analysis.  See Doggett, 505 U.S. at 652 n.1.  Here, the delay between defendant's indictment (on June 30, 2006) and arrest (on May 27, 2006) was nearly 23 months.  Hence, the Court must conduct the Barker analysis to determine whether defendant's Sixth Amendment rights have been violated.

"[O]nce the accused makes this threshold showing, 'the court must then consider . . . the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.'"  Tchibassa, 452 F.3d at 923 (quoting Doggett, 505 U.S. at 652).  As a practical matter, once the threshold of more than one year is exceeded, the length of the delay does not strongly sway the ultimate outcome of the speedy trial issue.  For example, in Tchibassa, the court held that the defendant's speedy trial right was not violated because an eleven-year delay was outweighed by the court's conclusion that the defendant, not the government, was to blame for the

delay.  In contrast, when a delay is the fault of the government, courts have held that delays as

short as two years are unconstitutional.  See, e.g., United States v. Ingram, 446 F.3d 1332 (11th

Cir. 2006) (two-year delay); Maples v. Stegall, 427 F.3d 1020 (6th Cir. 2005) (25-month delay).

Hence, although the 23-month delay at issue here plays into the ultimate weighing of factors, it

does not strongly tip the balance in either direction.

## II.    Second Factor:  Whether the Government or the Defendant Is to Blame for the Delay

The government has "'an affirmative constitutional obligation to try the defendant in a

timely manner,' and thus, the burden is on the prosecution to explain the cause of the pre-trial

delay."  United States v. Graham, 128 F.3d 372, 374 (6th Cir. 1997) (quoting Redd v. Sowders,

809 F.2d 1266, 1269 (6th Cir. 1987)).  To carry out that affirmative constitutional obligation, the

government must "pursue[] [the defendant] with reasonable diligence from his indictment to his

arrest."  See Doggett, 505 U.S. at 656.  Hence, even when there is a delay between indictment and

arrest, as here, the government is not at fault when it shows that it pursued defendant with

reasonable diligence.  See Barker, 407 U.S. at 531.  Certainly, "[a] deliberate attempt to delay the

trial in order to hamper the defense should be weighted heavily against the government."  Id.  "A

more neutral reason such as negligence . . . should be weighted less heavily but nevertheless

should be considered since the ultimate responsibility for such circumstances must rest with the

government rather than with the defendant."  Id.  Here, defendant does not argue that the

government deliberately caused the delay.  The issue, rather, is whether the government pursued

defendant with "reasonable diligence" or whether it was negligent in carrying out its obligation.

The Court must focus, then, on the efforts the government undertook to secure defendant's return

to the United States.

In cases such as this one -- where a defendant is located abroad for much of the delay -- the hallmark of government diligence is extradition.  When the United States has a valid extradition treaty in place with a foreign country and prosecutors formally seek extradition pursuant to that treaty, courts routinely hold that the government has satisfied its diligence obligation.  See, e.g., Tchibassa, 452 F.3d at 925.  On the other hand, if the government presents "substantial evidence" that extradition would be futile, then an extradition request normally is not necessary.  For example, in United States v. Corona-Verbera, 509 F.3d 1105, 1114-15 (9th Cir. 2007), the court held that a representation from an Assistant U.S. Attorney that Mexico would not surrender its own citizens wanted on drug charges, bolstered by expert testimony, a U.S. State Department report, and statistical evidence, constituted "substantial evidence" that seeking extradition of a Mexican national wanted on drug charges during the 1990s would be futile.  Another example is United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988), where the court was persuaded that extradition of a Colombian national living in Colombia from 1975 to 1985 would be futile.  The government presented evidence that a pre-1982 extradition treaty did not require Colombia to surrender its citizens, as well as a statement from the Colombian president that he would not enforce a post-1982 version of the extradition treaty that did provide for the extradition of Colombian citizens.

Similarly, the government usually satisfies its diligence obligation if it shows that it attempted extradition informally.  In United States v. Walton, 814 F.2d 376, 379 (7th Cir. 1987), for example, the government informally contacted Swedish officials on numerous occasions to determine whether extradition of a defendant was possible.  The Swedish officials responded that it was not.  The court held that the government was sufficiently diligent for Sixth Amendment

purposes.  Id.; see also United States v. Valencia-Quintana, 136 Fed. Appx. 707 (5th Cir. 2005)

(holding that "[a]lthough the government did not formally request extradition," the government

satisfied its diligence obligation by "procur[ing] an agreement from Dominican officials to notify

the [government] prior to [defendant's] release" from a Dominican jail).

Here, the government has not sought extradition formally or informally, nor has it

presented substantial evidence that extradition would have been futile.  The government does not

dispute that the United States and India have a functioning extradition treaty in place.  See Gov't

Ex. 6.  But the only conversation government investigators and prosecutors had about the

possibility of extradition occurred in mid-November 2007 -- more than sixteen months after

defendant was indicted.  See Tr. at 46-48, 57, 60.  In that conversation, Hill and McCarthy were

told that extradition might take several years.  Id. at 47, 57.  This is meager evidence that

extradition would have been futile; it does not approach the definitive, multi-source evidence

other courts have found sufficient to excuse a failure to request extradition.  See, e.g., Corona-

Verbera, 509 F.3d at 1114-15; Blanco, 861 F.2d at 778.  Moreover, this single conversation

occurred well over a year after the government learned that defendant was in India.  Hence, if an

attempt at extradition is the sine qua non of government diligence -- and some courts have held

that it is, see United States v. Pomeroy, 822 F.2d 718, 721-22 (8th Cir. 1987) -- then the

government has failed to satisfy its affirmative obligation here.

The government has failed to satisfy its diligence obligation even if extradition is not

required.  "[R]easonable diligence" demands "serious effort[s]."  See Doggett, 505 U.S. at 652,

656.  Over a 23-month period, the government took only two affirmative steps in attempting to

secure defendant's return:  entering defendant's name into two government databases and initiating

a "ruse" with a SSA special agent. Entering a criminal defendant's name into a database is a routine matter and does not satisfy the government's diligence obligation. See United States v. Mendoza, 530 F.3d 758, 763-64 (9th Cir. 2008). Nor does the SSA ruse constitute reasonable diligence. The government could not reasonably have expected that defendant would return to the United States from India based on a brief flurry of email correspondence from a SSA "field representative" requesting a meeting. This conclusion is underscored by the fact that Special Agent Stephenson provided defendant with the option of meeting with consulate staff in India rather than returning to the United States. See Gov't Ex. 1 at 4. And after August 2006, the government's affirmative efforts to secure defendant's return ceased entirely.

In late 2007, in response to several requests made by defendant, the government took additional steps to hasten defendant's return to the United States. In November 2007, the government issued him a new passport (at his request) and expedited the issuance of an exit permit (also at his request). Then, in December 2007, defendant contacted Special Agent Stephenson, thereby setting off another flurry of correspondence in which Stephenson and his supervisor urged defendant to return to the United States. But even if the government can be credited with these actions, they were taken approximately fifteen months after the government's last prior contact with defendant. This fifteen-month gap during which the government took no steps whatever to secure defendant's return might, on its own, constitute a violation of defendant's Sixth Amendment right to a speedy trial. Based on the record, the Court concludes that the government was negligent in securing defendant's return to the United States.

The second factor does not focus exclusively on the government's efforts; it also examines the defendant's role in causing the delay. See Tchibassa, 452 F.3d at 924-26. Cases where a

-11-

defendant lived abroad for much of the delay generally fall into three categories.  First are the cases like <u>Doggett</u>, in which the defendant was unaware of charges, left the country for unrelated reasons, and made no attempts to avoid detection.  Next are cases like <u>United States v. Arceo</u>, 535 F.3d 679, 685 (7th Cir. 2008), where the defendant fled the country in a "calculated effort to avoid arrest and prosecution" and lived under a false name.  These two categories present courts with little difficulty.  If a defendant falls into the first category, the government is normally faulted for a long delay; if he falls into the second category, the defendant himself is generally to blame.

Difficulties arise in the third category of cases:  where the defendant knows about charges, leaves the country or remains abroad for reasons unrelated to imminent or pending charges in the United States, makes no effort to hide from U.S. authorities while abroad, but nonetheless does not return to the United States and turn himself in upon request.  The few courts faced with cases from this difficult third category have arrived at differing conclusions.  <u>Compare</u> <u>United States v. McDonald</u>, 172 F. Supp. 2d 941, 949-50 (W.D. Mich. 2001) (holding that a defendant who had lived in the Bahamas with knowledge of U.S. criminal charges was not to blame for an excessive delay because the government was more at fault for not seeking extradition), <u>with</u> <u>United States v. Manning</u>, 56 F.3d 1188, 1195 (9th Cir. 1995) (holding that a defendant who was incarcerated in Israel with knowledge of U.S. criminal charges was more to blame than the government because he resisted informal attempts to secure his return to the United States, thereby "forcing the government to run the gauntlet of obtaining formal extradition").

The present case falls into this third category.  When defendant left for India, he knew that charges were imminent -- his attorneys had been engaged in plea negotiations for several months.  Even if defendant did not know the particulars of the charges (the indictment was sealed), he

knew the conduct that was at issue and, as evidenced by the draft letter found in his suitcase upon his return, he knew that an arrest warrant had been issued.  See Gov't Ex. 4.  But the government does not argue that defendant traveled to India because charges were imminent.  Rather, he appears to have left for India to attend to an unrelated legal proceeding there.  See Gov't Ex. 5. While in India, he lived under his own name and could readily be contacted by U.S. authorities. Indeed, as evidenced by the ruse and defendant's interactions with the U.S. consulate in Mumbai, the U.S. government had no trouble keeping tabs on defendant and even communicating with him.

Having decided that the government was negligent in failing to attempt to secure defendant's return to the United States but that defendant's own actions contributed to the delay, the Court must decide "whether the government or the criminal defendant is more to blame."  See Doggett, 505 U.S. at 651 (emphasis added).  The government, while not entirely derelict carrying out its obligation to bring defendant promptly to trial, failed to pursue the most obvious step for securing defendant's return to the United States -- extradition -- and has not provided substantial evidence that extradition would have been futile.  Nor has the government adequately explained why, for over sixteen months, it apparently gave no thought whatsoever to extradition.  The steps the government did take -- a half-hearted "ruse" and entering defendant into several databases -- were not "serious efforts" at "reasonable diligence."  And after those minimal steps were taken, the government took no affirmative steps to secure defendant's return; he ultimately returned of his own volition.

But defendant is not blameless, either.  He knew that charges were imminent when he left for India and, once abroad, appears to have known that an arrest warrant was issued.  However, there is no evidence that he sought to frustrate the government's efforts at securing his return.

When a defendant intentionally takes steps to frustrate the government's efforts in carrying out its Sixth Amendment obligation, then the defendant bears the brunt of the responsibility for a delay. See, e.g., Arceo, 535 F.3d at 685.  Here, however, defendant's unwillingness to travel back to India to meet with a SSA "field representative" -- whose request for a meeting, to defendant's knowledge, had nothing to do with potential criminal charges -- cannot be interpreted as an attempt to frustrate the government's efforts to provide defendant with a speedy trial.  Moreover, defendant lived openly and in his own name; the government knew how to contact him.  Indeed, he appears to have returned to the United States fully expecting to be arrested upon his return.

The facts of this case present a closer question than most other speedy trial cases. Defendant did not seek to turn himself in, nor did the government actively seek to secure his return.  In that, they are equally to blame.  But the burden of providing a speedy trial lies with the government, not the defendant.  See Doggett, 505 U.S. at 656; Barker, 407 U.S. at 531.  The prosecution therefore must explain the reason for any lengthy pre-trial delay, see Graham, 128 F.3d at 374, which it has not sufficiently done here.  On these facts, then, the Court cannot conclude that the government has carried its burden on the essential cause-of-delay factor.  Hence, the second factor -- the "flag all litigants seek to capture," Loud Hawk, 474 U.S. at 315 -- weighs in favor of defendant.

## III.    Third Factor:  The Defendant's Assertion of his Speedy Trial Right

The third factor -- the defendant's assertion of his speedy trial right -- is to a certain extent subsumed by the second factor in this case.  In a concurring opinion in Dickey v. Florida, 398 U.S. 30, 48 (1970), cited by the Barker majority in establishing the four-factor test used in the speedy trial analysis, see 407 U.S. at 530 n.30, Justice Brennan identified three factors rather than four,

-14-

writing that a defendant's assertion of his speedy trial right is captured within the assessment of the reason for a delay.  Although Barker ultimately set out four factors, the Supreme Court noted that "there is little difference between [Justice Brennan's] approach and the one we adopt today." Id.  Justice Brennan's observation in Dickey was prescient -- in applying the third factor, courts essentially repeat their assessment of the defendant's role in causing a delay.  See, e.g., Tchibassa, 452 F.3d at 926.  Although the third factor is of course relevant to the balance of factors, this Court bears in mind that the four-factor approach effectively counts defendant's conduct twice, even though the government, not the defendant, bears the burden of providing a speedy trial.

Here, defendant knew that charges were imminent when he left for India.  At some point, he learned that an arrest warrant had been issued for him, as demonstrated by the draft letter found in his luggage.  Gov't Ex. 4 (dated December 12, 2007).  Defendant does not appear to have known precisely what the charges were until his arrest.  The indictment was sealed, and defendant told Special Agent Stephenson on December 22, 2007 that he "did not know why his benefits were terminated."  Tr. at 30.  But even if defendant did not know the specifics of the indictment, awareness of charges, coupled with a failure to assert a speedy trial right while abroad in India, is enough to tip this factor somewhat against him.  See Tchibassa, 452 F.3d at 926 n.8 (noting that Doggett "appeared concerned generally with [defendant's] awareness vel non that charges were pending against him rather than with his specific knowledge that a formal indictment had been filed").  Defendant did not assert his speedy trial right until after his arrest, and hence, the third factor weighs slightly in favor of the government.

## IV.    Fourth Factor:  Prejudice

The fourth and final factor is prejudice.  The Supreme Court has identified three kinds of

prejudice caused by excessive delay:  "'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the accused's defense will be impaired' by dimming memories and loss of exculpatory evidence." Doggett, 505 U.S. at 654 (quoting Barker, 407 U.S. at 532) (brackets omitted).  "Of these forms of prejudice, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" Id. (quoting Barker, 407 U.S. at 532).  And "Barker explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" Id. at 655 (quoting Barker, 407 U.S. at 532).  Hence, no showing of prejudice is required when the delay is over a year and attributable to the government. United States v. Shell, 974 F.2d 1035, 1036 (9th Cir. 1992) (citing Doggett, 505 U.S. at 657-58).  If the government is more to blame for delay than the defendant, then prejudice is presumed. See Doggett, 505 U.S. at 657.  "In legal proceedings, when one party is entitled to a 'presumption' of a particular fact, he is not required to prove anything; it is the other party that must rebut the presumption, for example, as when the government must rebut the presumption of innocence in a criminal case." United States v. Dionisio, Cr.No. 04-30, 2008 WL 4949914, at *4 (W.D. Wis. Nov. 17, 2008) (citing Black's Legal Dictionary 1223 (8th ed. 2004)).

Here, the second factor (cause of delay) favors defendant and the delay was greater than a year, so the government must rebut the presumption of prejudice.  The government attempts to do so with three arguments. See Def. Opp. at 16-17.  First, the government argues that defendant knew of potential charges before he left for India -- and while he was in India -- so he was not precluded from preparing a defense.  Second, this case will not, the government contends, "depend exclusively on eyewitness memory of events." Id.  Finally, the government argues that

certain chemical samples that might have degraded because of the passage of time were tested by the government before defendant's indictment, and defendant can adequately challenge the results of those tests with an expert witness.  Id.

None of these arguments rebuts the Doggett presumption of prejudice.  Although defendant knew that some charges were imminent, he did not know what crimes he was charged with until after he was arrested.  The indictment was sealed, and the record reveals that the charges discussed in pre-indictment plea negotiations were not the charges ultimately contained in the indictment.  See Def. Ex. 1 ¶ 4 (attached to Def. Mot.).  Moreover, the indictment charges defendant with false statements and conflict of interest dating to 2001.  Even if the case does not depend "exclusively" on witness testimony, it will doubtless depend on some witness testimony, and an additional 23-month delay has surely contributed to fading memories.  Finally, the Court cannot conclude on this record whether chemical samples have degraded or not, and whether timely government testing alleviates that concern.  The inability to predict prejudice at this juncture is the reason courts presume prejudice if a delay of more than one year is primarily attributable to the government.  See Doggett, 505 U.S. at 655 ("[W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.").  Because the government has not rebutted the Doggett presumption of prejudice, the fourth factor weighs in favor of defendant.

## V.      Balancing

Finally, the Court must balance the four factors.  As to the first factor -- the length of delay -- the 23-month delay here between indictment and arrest is not as extraordinary as in other cases, which can involve delays of ten or more years.  See, e.g., Tchibassa, 452 F.3d at 922.  But the

delay is nonetheless nearly twice as long as the threshold one-year requirement needed to trigger a

Barker analysis, and courts have dismissed cases on speedy trial grounds based on delays of

similar length.  See, e.g., Ingram, 446 F.3d at 1332.  The second factor assesses whether the

government or the defendant is more to blame for the delay.  Although defendant is not entirely

blameless, the government is more at fault for the delay here.  The government bears the

responsibility for providing a speedy trial, yet it failed to take the most obvious step to secure

defendant's return -- seeking extradition -- and has not provided substantial evidence that

extradition would have been futile.  The few affirmative steps the government did take were

routine or unlikely to be effective.  The third factor essentially repeats the analysis of defendant's

role in causing the delay.  Because defendant knew that charges were imminent when he departed

for India, this factor weighs in favor of the government.  Finally, because the government is more

to blame for the excessive delay here, defendant is entitled to a presumption of prejudice, which

the government has not rebutted.

     This case presents a closer question than in most speedy trial cases.  A common thread

throughout Sixth Amendment jurisprudence is that the second Barker factor -- determining the

party that bears blame for the delay -- drives the ultimate balancing of factors and hence resolution

of the speedy trial issue.  Fittingly, the Supreme Court has described this factor as the "flag all

litigants seek to capture."  Loud Hawk, 474 U.S. at 315.  Here, that second factor favors

defendant.  So, too, does the fourth factor, because the government has not rebutted the

presumption of prejudice.  The first factor does not strongly favor either party.  The only factor,

then, that squarely favors the government is the third, and that factor -- often subsumed by the

second -- cannot by itself carry the day.  When the government is more to blame than a defendant

for a delay, to allow the defendant's tardy invocation of his speedy trial right to trump the

government's negligence in attempting to secure defendant's return would effectively place the

burden of providing a speedy trial on the defendant, not the government.  That turns the

constitutional obligation on its head.  As Justice Brennan wrote in his concurring opinion in

Dickey:

> [I]t is possible that the implication of waiver from silence or
> inaction misallocates the burden of ensuring a speedy trial.  The
> accused has no duty to bring on his trial.  He is presumed innocent
> until proved guilty . . . .  The government, on the other hand, would
> seem to have a responsibility to get on with the prosecution, both
> out of fairness to the accused and to protect the community
> interests in a speedy trial.  Judge Weinfeld of the District Court for
> the Southern District of New York has observed, "I do not
> conceive it to be the duty of a defendant to press that he be
> prosecuted upon an indictment under penalty of waiving his right
> to a speedy trial if he fails to do so.  It is the duty of the public
> prosecutor, not only to prosecute those charged with crime, but
> also to observe the constitutional mandate guaranteeing a speedy
> trial.  If a prosecutor fails to do so, the defendant cannot be held to
> have waived his constitutional right to a speedy trial."

398 U.S. at 50 (quoting United States v. Dillon, 183 F. Supp. 541, 543 (S.D.N.Y. 1960)).

Here, then, the all-important second factor favors defendant, as does the fourth factor.

Combined, these factors plainly outweigh the often-subsumed third factor, which favors the

government.  Accordingly, under Barker, Doggett, and their progeny, the government has not

satisfied its Sixth Amendment obligation to provide defendant with a speedy trial, and this

indictment must be dismissed.

## CONCLUSION

The government has not satisfied its obligation to provide defendant with a speedy trial.

Accordingly, defendant's motion to dismiss on speedy trial grounds will be granted and the

indictment in this case will be dismissed.  Defendant's remaining motions will be denied as moot.

A separate order accompanies this opinion.


_____
/s/
JOHN D. BATES
United States District Judge

Dated:  May 26, 2009